**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                            )
**JAMES MADISON PROJECT, et al.,**          )
                                            )
    **Plaintiffs,**      )
                                            )
      **v.**    )     **Case No. 17-cv-00144 (APM)**
                                            )
**DEPARTMENT OF JUSTICE, et al.,**          )
                                            )
    **Defendants.**      )
_____ )

## MEMORANDUM OPINION

## I.    INTRODUCTION

The now infamous "Trump Dossier" is a collection of memoranda prepared by former British intelligence operative Christopher Steele during the 2016 presidential election concerning then-candidate Donald J. Trump. As has been reported extensively in the media, the 35-page Dossier contains, among other things, allegations that the government of Russia possesses compromising personal and financial information about President Trump.

Though the Dossier and its contents animate this case, the case's actual subject matter concerns a related document—a two-page synopsis of the Dossier (the "Synopsis") that certain executive branch officials presented to President-elect Trump in January 2017. After media reports surfaced that President-elect Trump had received the Synopsis, Plaintiffs James Madison Project and Josh Gerstein filed a Freedom of Information Act request with various executive branch agencies seeking a copy of the Synopsis, as well as any documents related to any "final determinations" reached by those agencies regarding the factual accuracy of the allegations in the Synopsis.

Not surprisingly, none of the agencies made any meaningful disclosures. Three agencies—the Office of the Director of National Intelligence ("ODNI"), the Central Intelligence Agency ("CIA"), and the National Security Agency ("NSA")—acknowledged that they possess the Synopsis, but refused to produce it. Additionally, these agencies declined to confirm or deny whether they have any "final determinations" regarding the allegations contained in the Synopsis or related investigative files—an answer known as a "*Glomar* response." Another agency—the Federal Bureau of Investigation ("FBI")—took a slightly different approach: It issued a blanket *Glomar* response to the entirety of Plaintiffs' request. That is, the FBI refused to confirm or deny that it has any of the requested records. Plaintiffs contend that these *Glomar* responses are improper because President Trump and two past executive branch officials—former Director of National Intelligence James Clapper and former Director of the FBI James Comey—have publicly acknowledged, through tweets and other statements, the existence of the Synopsis and related records. The agencies stand by their *Glomar* responses.

Before the court are the parties' cross-motions for summary judgment. For the reasons set forth below, the court holds that none of the President's statements, whether made by tweet or otherwise, constitute the type of official acknowledgement of the existence of the requested records that is necessary to overcome the agencies' *Glomar* responses. The same holds true for the statements of the former executive branch officials. Finally, the court finds that ODNI, CIA, and NSA properly withheld the Synopsis, and that neither President Trump nor former FBI Director Comey has officially disclosed its contents. Accordingly, Defendants' Motion for Summary Judgment is granted and Plaintiffs' Cross-Motion for Partial Summary Judgment is denied.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    *The Synopsis*

Following the 2016 presidential general election, President Barack Obama assigned Director of National Intelligence James Clapper the task of preparing an intelligence report addressing the activities of the Russian government in connection with the election. Director Clapper delegated this task to the National Intelligence Council ("NIC"), a component of ODNI comprised of senior analysts and national security policy experts. The NIC coordinated with and drew intelligence from the CIA, the NSA, and the FBI to draft a classified analytical assessment.

On January 6, 2017, ODNI released to the public a declassified version of that assessment, entitled "Assessing Russian Activities and Intentions in Recent U.S. Elections." *See* Defs.' Mot. for Summ. J., ECF No. 14 [hereinafter Defs.' Mot.], Ex. E, ECF No. 14-7. The declassified assessment covers "the motivation and scope of Moscow's intentions regarding US elections and Moscow's use of cyber tools and media campaigns to influence US public opinion." Defs.' Mot., Ex. E, ECF No. 14-7, at i.

At about the same time, intelligence officials shared a classified version of the assessment with President-elect Trump. On January 11, 2017, CNN reported that senior intelligence officials appended to the classified assessment a two-page synopsis of the allegations contained in the Dossier. *See* Defs.' Mot., Ex. G, ECF No. 14-9.

#### 2.    *Plaintiffs' FOIA Request*

Plaintiff James Madison Project is a non-partisan organization established to promote government accountability and the reduction of secrecy on issues relating to intelligence and

national security. Am. Compl., ECF No. 7 [hereinafter Am. Compl.], ¶ 3. Plaintiff Josh Gerstein is the senior White House reporter for Politico and a news media representative. Am. Compl. ¶ 4.

Referring to the above-cited CNN report for context, Plaintiffs submitted a Freedom of Information Act ("FOIA") request by letters dated January 11, 2017, to ODNI, CIA, FBI, and NSA seeking production of the Synopsis and any documents or investigative files related to any final determinations reached regarding the factual accuracy of the allegations contained in the Synopsis. Noting the considerable public interest in shedding light on the degree to which any federal intelligence or law enforcement agency viewed the allegations contained in the Dossier as credible, Plaintiffs specifically requested Defendants produce the following records:

> (1) The two-page "synopsis" provided by the U.S. Government to President-Elect Trump with respect to allegations that Russian Government operatives had compromising personal and financial information about President-Elect Trump ("Item One");
>
> (2) Final determinations regarding the accuracy (or lack thereof) of any of the individual factual claims listed in the two page synopsis ("Item Two"); and
>
> (3) Investigative files relied upon in reaching the final determinations referenced in [Item Two] ("Item Three").

See Am. Compl. ¶¶ 14, 20, 24, 28; see, e.g., Defs.' Mot., Ex. C, ECF No. 16 [hereinafter Hardy Decl.], Ex. A. At the time of the filing of this action, none of the agencies had provided a substantive response to Plaintiffs' FOIA demand. Am. Compl. ¶¶ 32, 35, 38, 41.

**B.    Procedural History**

On January 23, 2017, Plaintiffs brought this action under FOIA, naming as Defendants the Department of Justice, as the parent agency of the FBI; the Department of Defense, as the parent agency of the NSA; the CIA; and the ODNI (collectively, "Defendants"). Compl., ECF No. 1. Before Defendants filed a responsive pleading, Plaintiffs filed an Amended Complaint on February

4

13, 2017. Am. Compl. Their suit seeks an order compelling Defendants to produce the requested records. *Id*. at 8.

Defendants now move for summary judgment, although they part ways in their approaches. The FBI relies on a *Glomar* response to all three items of Plaintiffs' request, thereby refusing to confirm or deny the existence of any responsive records.[1] Citing FOIA Exemption 7(A), 5 U.S.C. § 552(b)(7)(A), the FBI contends that merely acknowledging the existence or non-existence of responsive records in the FBI's files would "require the FBI to confirm or deny whether it has and is investigating the alleged 'dossier' and synopsis, either in a separate investigation or as part of its Russian interference investigation," which itself could hamper and interfere with any such investigation. *See* Hardy Decl. The FBI therefore asserts a blanket *Glomar* response.

The remaining Defendants—ODNI, CIA, and NSA (the "Intelligence Community Defendants")—also invoke *Glomar* responses, but their response departs from the FBI's in one important respect: They confirm that they have identified a two-page document responsive to Item One of the Plaintiffs' FOIA request. They contend, however, that the document must be withheld in full pursuant to FOIA Exemption 1, 5 U.S.C. § 552(b)(1), and Exemption 3, 5 U.S.C. § 552(b)(3). *See* Defs.' Mot., Ex. B, ECF No. 14-4 [hereinafter Gistaro Decl.].[2] As for Items Two and Three, like the FBI, the Intelligence Community Defendants invoke FOIA Exemptions 1 and 3 to justify their *Glomar* responses. In their view, the mere act of confirming whether they even have such records would reveal a classified fact—whether the Intelligence Community has verified or attempted to verify the truth of the Dossier's allegations. Gistaro Decl. at 8–10. Specifically,

---

[1] The phrase "*Glomar* response" derives from *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976), in which the CIA refused to confirm or deny the existence of records relating to the "Hughes Glomar Explorer," a ship allegedly deployed by the U.S government to raise a sunken Soviet submarine for analysis by the U.S. military and intelligence community. *See Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1171 (D.C. Cir. 2011).

[2] The Intelligence Community Defendants also have prepared a classified declaration to support its assertion that the withholding of the Synopsis pursuant to FOIA Exemption 1 is appropriate. *See* Defs.' Mot., Ex. I, ECF No. 14-11. The court reviewed this declaration *in camera*.

the Intelligence Community Defendants assert that confirming or denying the existence of responsive records as to Items Two and Three would "reveal that the two-page synopsis played some role in the [Intelligence Community's] conclusions [in the classified analytical assessment], which would, in turn, be revealing of the analytic process employed for this intelligence assessment." *Id.* at 9. So, although the Intelligence Community Defendants concede they have the Synopsis, they refuse to admit the existence of any other responsive records.

Plaintiffs oppose Defendants' Motion largely on one ground. *See* Pls.' Opp. to Defs.' Mot., ECF No. 17; Pls.' Cross-Mot. for Partial Summ. J., ECF No. 18 [hereinafter Pls.' Cross-Mot.]. Plaintiffs do not challenge Defendants' invocation of any of the FOIA Exemptions upon which their *Glomar* responses are predicated. Stated differently, they do not contest that the fact of the existence or non-existence of the requested records is subject to FOIA Exemptions 1, 3, and 7(A). Rather, Plaintiffs assert that Defendants' *Glomar* responses are vitiated because President Trump has officially acknowledged the existence of the records Plaintiffs seek in his tweets and other public statements. So, too, have two past executive branch officials, former Director of National Intelligence James Clapper and former Director of the FBI James Comey. Plaintiffs also assert that official public disclosures of some of the specific information contained in the Synopsis create a genuine issue of material fact that precludes granting summary judgment in favor of the Intelligence Community Defendants as to their withholding of the Synopsis itself.

## III. LEGAL STANDARD

Most FOIA cases are appropriately decided on motions for summary judgment. *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011). Summary judgment is appropriate when the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The agency can

carry its burden on summary judgment if it submits affidavits or declarations that "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (internal quotation marks omitted). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting *Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)). On the other hand, "a motion for summary judgment should be granted in favor of the FOIA requester where an agency seeks to protect materials which, even on the agency's version of the facts, falls outside the proffered exemption." *Smith v. CIA*, 246 F. Supp. 3d 28, 31 (D.D.C. 2017) (internal quotation marks omitted).

## IV.  *GLOMAR* STANDARDS

The parties' dispute raises two predicate legal questions the answers to which are critical to framing the merits of this case. First, what is the applicable legal standard to determine whether the existence of the Synopsis, "final determinations," and related records have been "officially acknowledged?" Second, what weight, if any, should the court give to the public statements of *former* executive branch officials who have commented on the Dossier and Synopsis since leaving their government posts? The court addresses each of these questions in turn.

### A.  "Official Acknowledgment" in the *Glomar* Context

The court starts with the basics. A *Glomar* response is "an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information." *Roth v. U.S.*

*Dep't of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011). Thus, a *Glomar* response is allowable only "when confirming or denying the existence of records would itself 'cause harm cognizable under an FOIA exception.'" *Id.* at 1178 (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)). In other words, a *Glomar* response is appropriate when revealing the very fact that an agency possesses responsive records would itself be subject to a FOIA exception.

A dissatisfied requester may challenge a *Glomar* response in "two distinct but related ways." *Agility Pub. Warehousing Co. K.S.C. v. NSA*, 113 F. Supp. 3d 313, 326 (D.D.C. 2015). First, a requester can challenge the agency's assertion that confirming or denying the existence of records would cause harm under the FOIA exception invoked by the agency. *See id.* Second, a requester can demonstrate that the agency has previously "official acknowledged" the fact of the existence of a requested record. *See id.* If the requester take the second approach and shows that the agency has "officially acknowledged" that it possesses records responsive to the FOIA request, "the agency can no longer use a *Glomar* response" and therefore must either "(1) disclose the record to the requester or (2) establish that its contents are exempt from disclosure and that such exemption has not been waived." *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011) (internal citation omitted).

In this case, Plaintiffs assert only the second basis to overcome Defendants' *Glomar* responses. *See* Pls.' Cross-Mot., Mem. in Opp. to Defs.' Mot. & in Supp. of Pls.' Cross-Mot., ECF No. 18-1 [hereinafter Pls.' Mem.],[3] at 5. They do not contest the agencies' reliance on Exemptions 1, 3, and 7(A) as the grounds for those responses. Thus, the court need not inquire

---

[3] Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, ECF No. 17-1, is substantially the same as their Memorandum in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment, ECF No. 18. The court refers to the memorandum accompanying Plaintiffs' cross-motion throughout this opinion.

whether Defendants have shown that "the fact of the existence or nonexistence of agency records falls within a FOIA exemption." *Wolf*, 473 F.3d at 374.

### 1. The Applicable Standard

With official acknowledgement as the sole issue, the court turns to the particulars of that doctrine. The parties agree that while a plaintiff bears the initial burden of pointing to specific public statements that officially acknowledge the records subject to a *Glomar* response, the agency bears the ultimate burden of justifying its *Glomar* response. *See Am. Civil Liberties Union (ACLU) v. CIA*, 710 F.3d 422, 427–28 (D.C. Cir. 2013). The parties disagree, however, as to *how precisely* a plaintiff must establish that an agency has officially acknowledged the existence of a document.

Defendants argue for a strict standard under which the official statement identified by the Plaintiffs must "match[] exactly" the documents requested in order to waive a *Glomar* response. Defs.' Suppl. Submission, ECF No. 29 [hereinafter Defs.' Mem. re: Tweets], at 2; Oral Arg. Tr., ECF No. 32 [hereinafter Arg. Tr.], at 4:8–15. Their proposed standard derives from *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990), wherein the D.C. Circuit identified three criteria to determine whether the *contents*—as distinct from the existence—of a withheld record have been "officially acknowledged" by an agency:

> First, the information requested must be as specific as the information previously released. Second, the information requested must match the information previously disclosed . . . . Third, . . . the information requested must already have been made public through an official and documented disclosure.

*Id*. at 765. *Fitzgibbon*'s "insistence on exactitude recognizes 'the Government's vital interest in information relating to national security and foreign affairs.'" *Wolf,* 473 F.3d at 378 (quoting *Pub. Citizen v. Dep't of State*, 11 F.3d 198, 203 (D.C. Cir. 1993)). According to Defendants, the D.C. Circuit applies this three-pronged test equally in the *Glomar* context.

Plaintiffs, on the other hand, urge rejection of Defendants' "overly-cramped interpretation" of the standard of proof required to overcome a *Glomar* response. Pls.' Reply to Defs.' Mem. re: Tweets, ECF No. 31 [hereinafter Pls.' Reply to Defs.' Mem. re: Tweets], at 2. They maintain that the specificity requirement in the *Glomar* context should be "applied in a manner slightly different than that which is ordinarily done with respect to the substantive contents of actual records," *id.* at 2–3 (citing *Wolf*, 473 F.3d at 379), and accordingly that "*Fitzgibbon*'s matching and specificity criteria . . . are not applicable in the *Glomar* context," *id.* at 3 (emphasis omitted) (quoting *Smith*, 246 F. Supp. 3d at 32). In their view, to overcome a *Glomar* response, a plaintiff must point to official disclosures that warrant a "logical and plausible" inference as to the existence or nonexistence of the requested records. Arg. Tr. at 16:12–18.

To the extent Plaintiffs contend that *Fitzgibbon*'s three-part test does not apply in the *Glomar* context, they are mistaken. The D.C. Circuit consistently has applied *Fitzgibbon*'s three prongs to evaluate a claim of "official acknowledgement" in the *Glomar* context. *E.g.*, *Mobley v. CIA*, 806 F.3d 568, 583–84 (D.C. Cir. 2015); *Moore*, 666 F.3d at 1333; *Wolf*, 473 F.3d at 378. That said, the three prongs of the *Fitzgibbon* test are not as differentiated in the *Glomar* context as they are with respect to a withheld document's contents. As the court explained in *Wolf*: "In the *Glomar* context . . . if the prior disclosure establishes the *existence* (or not) of records responsive to the FOIA request, the prior disclosure necessarily matches both the information at issue—the existence of records—and the specific request for that information." *Wolf*, 473 F.3d at 378–79 (citing *Fitzgibbon*, 911 F.2d at 765–66). In other words, in the *Glomar* context, the first and second prongs of *Fitzgibbon* merge into one and the third prong continues to operate independently. Ultimately, then, to overcome an agency's *Glomar* response when relying on an official acknowledgement, "the requesting plaintiff must *pinpoint* an agency record that both matches the

plaintiff's request and has been publicly and officially acknowledged by the agency." *Moore*, 666 F.3d at 1333 (emphasis added).

Plaintiffs also argue that the D.C. Circuit in *ACLU*, 710 F.3d 422 (D.C. Cir. 2013), announced a "slightly different" "official acknowledgement" standard in the *Glomar* context. *See* Pls.' Reply to Defs.' Mem. re: Tweets at 3–4; *see also* Arg. Tr. at 16–17. As support for their position, Plaintiffs point to the court's holding that the CIA's refusal to confirm the existence of records concerning drone strikes was "neither logical nor plausible" in light of public statements made by President Obama, Assistant to the President for Homeland Security and Counterterrorism John Brennan, and CIA Director Leon Panetta. *See* Pls.' Reply to Defs.' Mem. re: Tweets at 3–4 (citing *ACLU*, 710 F.3d at 428–32). They urge the court to apply the "logical nor plausible" standard here instead of the "specificity" requirement of *Fitzgibbon*. *Id.*

The court declines to do so for two reasons. First, as Defendants point out, the Circuit has applied *Fitzgibbon*'s three-pronged test in the *Glomar* context subsequent to *ACLU*, demonstrating that the Circuit plainly has not jettisoned the specificity requirement. *See Mobley*, 806 F.3d at 583–84. Second, Plaintiffs read *ACLU* too broadly. They conflate the specificity requirement of the official acknowledgement doctrine with the standard by which an agency's invocation of a FOIA exemption is judged. In the *Glomar* context, the specificity requirement concerns the "fit" between the particular records sought and the records that are the subject of the public official statements. So, as in *ACLU*, if a requester seeks records about drone strikes, and the agency refuses to confirm or deny the existence of those records, the public acknowledgment *must* bear out the existence of records concerning drone strikes, not something different, to overcome that *Glomar* response. Thus, the records sought must match the records whose existence the plaintiff claims are publicly acknowledged through official statements. The "logical nor plausible" language of

*ACLU*, by contrast, and which the court discusses further below, is used to evaluate an agency's justification for invoking a FOIA exemption to withhold records or issue a *Glomar* response. *Judicial Watch, Inc.*, 715 F.3d at 941. That standard is apparent from the *ACLU* court's reasoning that an agency's "justification" for invoking a *Glomar* response "is *sufficient* if it appears 'logical' or 'plausible.'" *ACLU*, 710 F.3d at 427 (emphasis added) (internal quotation marks omitted). Applying that standard, the court in *ACLU* found, based on the public statements of the President and key intelligence community officials, that it was "neither logical nor plausible" for the CIA to justify its refusal to confirm or deny whether it possessed records relating to drone strikes. *See id.* at 429–31. Accordingly, while *ACLU* establishes a standard relevant to the *Glomar* context, it does not displace the specificity requirement of *Fitzgibbon*.

### 2. *Quantum of Proof*

The discussion above begs the question: What type of proof is required to establish that the existence of a document has been officially acknowledged? The Circuit has provided guidance on this issue in two types of cases: (1) where the existence of responsive records is plain on the face of the official statement, *e.g.*, *Wolf*, 473 F.3d at 370, and (2) where the substance of an official statement and the context in which it is made permits the inescapable inference that the requested records in fact exist, *e.g.*, *ACLU*, 710 F.3d at 422. Defendants emphasize the former, while Plaintiffs emphasize the latter.

The first type of case is best illustrated by *Wolf*. In that case, Wolf, an historian, requested from the CIA "all records about Jorge Eliecer Gaitan," an assassinated Colombian politician. *Wolf*, 473 F.3d at 373. The CIA issued a *Glomar* response to the request, claiming that the fact of the existence or nonexistence of records regarding a foreign national was itself classified. *Id.* After the agency moved for summary judgment, Wolf asserted that the CIA had waived its right to issue

a *Glomar* response because then-CIA Director Admiral R.K. Hillenkoetter "officially acknowledged" the existence of responsive records by reading from official CIA dispatches referencing Gaitan during a 1948 congressional hearing. *Id.* at 373–74, 378. Drawing from *Fitzgibbon*, the D.C. Circuit confirmed the applicability of the "official acknowledgment" doctrine in the *Glomar* context and concluded that Director Hillenkoetter's testimony acknowledged the "specific information at issue"—the "existence *vel non* of records about Jorge Eliecer Gaitan." *Id.* at 378–79 (internal quotation marks omitted). Because Director Hillenkoetter read directly from CIA dispatches concerning "Gaitan, his followers, and their associates in connection with possible communist activity in Colombia," his official statements disclosed the existence of responsive records and waived the CIA's *Glomar* response. *Id.* at 378–79. Critically, though, the court's ultimate holding was quite narrow. The court held that the Director's official acknowledgment waiver related *only* to the existence or nonexistence of the records about Gaitan disclosed by Hillenkoetter's testimony. As a result, Wolf was entitled to disclosure of that information, "namely the existence of CIA records about Gaitan that ha[d] been previously disclosed"—the officially acknowledged dispatches—"*but not* any others." *Id*. at 379 (emphasis added). Thus, even though Wolf had requested "all records" about Gaitan, and the CIA's *Glomar* response was to the "all records" request, the court held that the CIA was not required to confirm or deny the existence of any other records that it might have in its possession.

The second type of *Glomar* case is best exemplified by *ACLU*. In that case, the ACLU requested from the CIA "records pertaining to the use of use of . . . drones . . . by the CIA and the Armed Forces for the purpose of killing targeted individuals." *ACLU*, 710 F.3d at 425. The CIA issued a *Glomar* response, arguing that confirming or denying whether it had responsive documents would reveal "whether or not the CIA is involved in drone strikes or at least has an

intelligence interest in drone strikes." *Id.* at 427. The ACLU challenged the CIA's *Glomar* response, arguing that the existence of such records had already been officially acknowledged by President Obama, Assistant to the President for Homeland Security and Counterterrorism John Brennan, and CIA Director Leon Panetta, in various public statements and speeches. *Id.* at 429–30. Though none of these official statements "specifically stated that the CIA has documents relating to drone strikes," *id.* at 430 (emphasis omitted), the D.C. Circuit held that the public statements left "*no doubt* that some U.S. agency" possessed such records, *id.* at 429 (emphasis added). According to the D.C. Circuit, the CIA was one such agency because, after all, "it strains credulity to suggest that an agency charged with gathering intelligence affecting the national security does not have an 'intelligence interest' in drone strikes"—the narrow interest the CIA sought to protect by invoking a *Glomar* response—"even if that agency does not operate the drones itself." *Id.* at 429–30. Additionally, the court observed that, in light of various public statements made by the CIA Director about the precision of targeted drone strikes, the level of collateral damage they cause, and their comparative usefulness to other weapons, "it is implausible that the CIA does not possess a single document on the subject of drone strikes." *Id.* at 431. The court reasoned:

> Unless we are to believe that the Director was able to "assure" his audience that drone strikes are "very precise and . . . very limited in terms of collateral damage" without having examined a single document in his agency's possession, those statements are tantamount to an acknowledgment that the CIA has documents on the subject.

*Id.* (alteration in original). Accordingly, the court concluded that, even though none of the public statements expressly acknowledged the existence of documents, the substance of those statements made it "neither 'logical' nor 'plausible' to maintain that the Agency does not have any documents relating to drones." *Id.*

Though distinct, these two types of cases are animated by the same principles. Regardless of whether the "existence *vel non*" of responsive records is plain from the face of the official statement or is established by an inference therefrom, the D.C. Circuit advises that the "official acknowledgement" doctrine must be applied "strictly." *See Moore*, 666 F.3d at 1333. So, "[a]n agency's official acknowledgement . . . cannot be based on . . . speculation, no matter how widespread." *Id.* at 1334 (quoting *Wolf*, 473 F.3d at 378) (alterations in original). Moreover, whether expressly or by inference, the official statement must render it "neither logical nor plausible" for the agency to justify its position that disclosure would reveal anything not already in the public domain. *ACLU*, 710 F.3d at 430. In light of these principles, courts must carefully scrutinize claims of official acknowledgment, particularly as here in the national security arena, *see id.* at 427, and subject such claims to stringent standards of precision and proof.

**B.      Statements by Public Officials**

Having established the applicable principles for evaluating a claim of official-acknowledgment waiver, the court tackles another threshold issue before it reaches the merits: What constitutes an "official" statement that can be relied upon to overcome a *Glomar* response? That question raises two sub-inquiries. First, what, if any, significance should be given to a presidential tweet? Second, of what relevance, if any, are the statements of Director of the FBI Comey and Director of National Intelligence Clapper *after they left government service* about the Dossier and the events surrounding the presentation of the Synopsis to President-elect Trump. The court now turns to those issues.

*1.      Statements of President Trump*

The D.C. Circuit has recognized that "[a] disclosure made by the President, or by [an] advisor acting as 'instructed' by the President," is attributable to executive branch agencies for

purposes of the official acknowledgement doctrine. *See ACLU*, 710 F.3d at 429 n.7. Does that rule apply to presidential tweets? Plaintiffs contend that a presidential tweet should be treated no differently than a presidential speech or a White House press release for purposes of the official acknowledgment doctrine. Defendants do not disagree. Asked by the court what significance and weight the President's tweets should be given, Defendants responded that "[t]he government is treating the statements upon which plaintiffs rely"—including presidential tweets—"as official statements of the President of the United States." Defs.' Mem. re: Tweets at 2. So, Defendants say, "a [tweet] by any other name would smell as sweet" as any other official statement, at least for purposes of the official acknowledgement doctrine. William Shakespeare, *Romeo and Juliet*, act 2, sc. 2. Accordingly, the court will consider the following statements made by the President, whether by tweet or some other medium, to determine whether any of the agencies' *Glomar* responses have been waived.

### a. May 9, 2017 Termination Letter

In a letter dated May 9, 2017, President Trump terminated and removed Director Comey from office. In the termination letter, President Trump expressed his appreciation to Director Comey for "informing [President Trump], on three separate occasions, that [he is] not under investigation." *See* Exs. to Defs.' Reply in Supp. of Defs.' Mot., ECF No. 20, [hereinafter Exs. to Defs.' Reply], Ex. C, ECF No. 20-4 [hereinafter Trump Termination Letter].

### b. May 11, 2017 NBC News Interview

On May 11, 2017, in an interview with NBC News, President Trump stated that he had spoken with Director Comey once over dinner and twice by phone. President Trump told NBC News that during these conversations, he "actually asked [Director Comey]" if he was under

investigation, and that Comey informed the President that he was not. Exs. to Defs.' Reply, Ex. D, ECF No. 20-5 [hereinafter Trump NBC News Interview], at 1.

c.     July 19, 2017 *New York Times* Interview

In a July 19, 2017, interview with three *New York Times* reporters—Peter Baker, Michael S. Schmidt, and Maggie Haberman—President Trump spoke most directly about the Dossier. Plaintiffs cite to the following excerpts of that interview:

> TRUMP: Look what they did to me with Russia, and it was totally phony stuff.
> HABERMAN: Which, which one?
> SCHMIDT: The dossier.
> TRUMP: The dossier.
> HABERMAN: The dossier. Oh, yes.
> ————
>
> TRUMP: Now, that was totally made-up stuff, and in fact, that guy's being sued by somebody. … And he's dying with the lawsuit. I know a lot about those guys, they're phony guys. They make up whatever they want. Just not my thing — plus, I have witnesses, because I went there with a group of people. You know, I went there with Phil Ruffin——
> HABERMAN: Oh, I didn't know that.
> ————
>
> TRUMP: I had a group of bodyguards, including Keith [Schiller] —
> HABERMAN: Keith was there, right?
> TRUMP: Keith was there. He said, "What kind of crap is this?" I went there for one day for the Miss Universe contest, I turned around, I went back. It was so disgraceful. It was so disgraceful.
> ————
>
> TRUMP: When he [James B. Comey] brought it [the dossier] to me, I said this is really made-up junk. I didn't think about anything. I just thought about, man, this is such a phony deal.
> HABERMAN: You said that to him?
> TRUMP: Yeah, don't forget——
> ————
>
> TRUMP: I said, this is — honestly, it was so wrong, and they didn't know I was just there for a very short period of time. It was so wrong, and I was with groups of people. It was so wrong that I really

17

> didn't, I didn't think about motive. I didn't know what to think other
> than, this is really phony stuff.

Exs. to Defs.' Reply, Ex. H, ECF No. 20-9 [hereinafter Trump *NY Times* Interview], at 15–17 (alterations in original).

### d. October 21, 2017 Fox Business Interview

In an October 21, 2017, interview with Lou Dobbs of Fox Business, President Trump was asked to comment on allegations that the campaign of Hillary Clinton and the Democratic National Committee funded research to "smear his presidential campaign." Defs.' Mem. re: Tweets, Ex. A, ECF No. 29-2 [hereinafter Trump Fox Business Interview]. President Trump responded in part:

> Don't forget Hillary Clinton totally denied this. She didn't know anything. She knew nothing. All of a sudden they found out. What I was amazed at, it's almost $6 million that they paid and it's totally discredited, it's a total phony. I call it fake news. It's disgraceful. It's disgraceful.

*Id.* at 1.

### e. October 31, 2017 White House Press Briefing

During a White House press briefing on October 31, 2017, a reporter asked White House Press Secretary Sarah Huckabee Sanders to provide a "definition of collusion" to support Huckabee Sanders's view that "Trump didn't collude [with the Russians] but Hillary did." Defs.' Mem. re: Tweets, Ex. B, ECF No. 29-3, at 9. Press Secretary Sanders responded, "Well, I think the exchanging [of] millions of dollars to create false information is a pretty big indication." *Id.*

### f. November 5, 2017 Full Measure Interview

In a November 5, 2017, interview on Full Measure, a weekly news show, President Trump was asked to respond to revelations that "the Hillary Clinton campaign . . . funded that so-called dossier." Defs.' Mem. re: Tweets, Ex. C, ECF No. 29-4 [hereinafter Trump Full Measure Interview], at 3.

The President responded in part:

> [W]hen you look at that horrible dossier which is a total phony fake
> deal like so much of the news that I read when you look at that and
> take a look at what's gone on with that and the kind of money we're
> talking about it is a disgrace.

*Id.*

### g. @realDonaldTrump Tweets

Plaintiffs have also directed the court to four tweets posted by President Trump from the

Twitter handle @realDonaldTrump:

> Workers of firm involved with the discredited and Fake Dossier take
> the 5th. Who paid for it, Russia, the FBI or the Dems (or all)?

Defs.' Resp. to Pls.' Notices of Suppl. Info., ECF No. 25 [hereinafter Defs.' Resp, to Pls.' Notices],

Ex. C, ECF No. 25-4 [hereinafter Oct. 19 Tweet].

> Officials behind the now discredited "Dossier" plead the Fifth.
> Justice Department and/or FBI should immediately release who paid
> for it.

Defs.' Resp. to Pls.' Notices, Ex. D, ECF No. 25-5 [hereinafter Oct. 21 Tweet].

> The House of Representatives seeks contempt citations(?) against
> the Justice Department and the FBI for withholding key documents
> and an FBI witness which could shed light on surveillance of
> associates of Donald Trump. Big stuff. Deep State. Give this
> information NOW! @foxnews

Pls.' Fourth Notice of Suppl. Info., ECF No. 31 [hereinafter Nov. 29 Tweet].

> WOW, @foxandfr[i]ends "Dossier is bogus. Clinton Campaign,
> DNC funded Dossier. FBI CANNOT (after all this time) VERIFY
> CLAIMS IN DOSSIER OF RUSSIA/TRUMP COLLUSION. FBI
> TAINTED." And they used this Crooked Hilary pile of garbage as
> the basis for going after Trump Campaign!

Pls.' Fifth Notice of Suppl. Info., ECF No. 34 [hereinafter Dec. 26 Tweet].

### 2. Statements of former FBI Director Comey

Moving on to statements of former executive branch officials, Plaintiffs ask the court to consider two categories of statements made by former FBI Director Comey: (1) statements made while Director Comey held public office and (2) statements made after his termination from office on May 9, 2017. For the reasons explained below, only those statements made by Comey when he was the Director of the FBI may be considered "official" statements.

In his capacity as Director of the FBI, Director Comey testified before the House Permanent Select Committee on Intelligence on March 20, 2017, and stated in pertinent part:

> [T]he FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election and that includes investigating the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts.

Defs.' Mot., Ex. J, ECF No. 14-12 [hereinafter Comey House Committee Testimony], at 8. Throughout his testimony, Director Comey declined to say whether the FBI was investigating the claims made in the Dossier. *See generally id.* There is no dispute that Director Comey's testimony before the House Committee constitute official statements of the FBI.

Statements he made after leaving government service, however, are a different matter. They do not constitute official statements and, therefore, cannot be treated as an official acknowledgement of the existence of a record. *See Mobley*, 806 F.3d at 583; *Afshar v. U.S. Dep't of State*, 702 F.2d 1125, 1133–34 (D.C. Cir. 1983) (holding that disclosures contained in books authored by former CIA agents and officials—screened and approved by the CIA—are not "tantamount to official executive acknowledgments"); *see also Hudson River Sloop Clearwater, Inc. v. U.S. Dep't of Navy*, 891 F.2d 414, 421–22 (2d. Cir. 1989) (concluding that affidavit of retired high-ranking naval officer "cannot effect an official disclosure of information" on behalf of the Navy). Here, after his

termination in May 2017, on June 8, 2017, Comey provided oral and written testimony to the Senate Select Committee on Intelligence ("SSCI"). *See* Exs. to Defs.' Reply, Ex. F, ECF No. 20-7 [hereinafter Comey SSCI Oral Testimony]; Exs. to Defs.' Reply, Ex. G, ECF No. 20-28 [hereinafter Comey SSCI Written Testimony]. Among other statements, Comey stated in his written testimony that, after a briefing concerning the intelligence community assessment of Russian efforts to interfere in the 2016 election, he briefed President Trump on January 6, 2017, about certain "salacious and unverified" material assembled during the assessment. Comey SSCI Written Testimony at 1. According to Comey, he and the President further discussed that material and the fact that the President was not under investigation during a subsequent dinner and two phone calls. *See id*. In his oral testimony, Comey explained that, as of the date of his termination, President Trump was not under investigation, and further explained that the basis upon which the FBI opens a counterintelligence investigation is its receipt of a "credible allegation that there is some effort to co-opt, coerce, direct, [or] employ[] covertly an American on behalf of the foreign power." Comey SSCI Oral Testimony at 10, 30. Under binding precedent, however, Plaintiffs cannot rely on Comey's testimony before the SSCI—given after he left public office—to support their waiver arguments.

Plaintiffs concede that the weight of authority is against them. They agree that, "ordinarily, the unofficial statements made by Director Comey . . . *after* [his] Government service would not be admissible here." Pls.' Reply at 6.[4] Plaintiffs nevertheless urge the court to consider Comey's

---

[4] In their opening brief, Plaintiffs asked that the court consider Comey's statements before the SSCI to be official statements because "the separate but related comments by President Trump constitute sufficient corroboration of [Comey's] disclosures." Pls.' Mem. at 9–10. In other words, Plaintiffs argued that because President Trump's official statements corroborate Director Comey's testimony before the SSCI, the former Director's unofficial statements are converted into official statements. *See id*. at 10–11. In their reply brief, Plaintiffs abandoned that argument, asserting instead they were "only seeking to incorporate by reference these unofficial disclosures for the purposes of demonstrating the existence of a genuine dispute of material fact in dispute warranting the denial of the Defendant's Motion." Pls.' Reply at 6. As discussed, the court rejects this argument.

unofficial statements "as *supplemental* information," but not "as the *primary* basis for evaluating an official acknowledgement argument, and only for the alternative purpose of demonstrating the existence of a genuine issue of material fact in dispute (if necessary)." *Id*. at 7. Plaintiffs contend that their position is warranted because of "President Trump's unconventional method and style of communication . . . . [, which] arguably opened the door to discretionary consideration of supplemental evidence that otherwise would ordinarily be precluded." *Id*. at 8. Plaintiffs suggest that Comey's unofficial statements about what transpired during his meetings with President-elect Trump "merely supplement the context of the discussions that President Trump has already officially acknowledged took place." *Id*. at 9. That context, according to Plaintiffs, is relevant to "the extent to which there is a genuine issue of material fact in dispute" as to Defendants' *Glomar* responses. *Id*.

The court declines to import Plaintiffs' novel suggestion to use a former official's statements as "supplemental" evidence into settled analytical framework. It is far from clear in what material ways Comey's statements "supplement" President's Trump's. True, Comey testified to facts that President Trump did not directly utter (or tweet). But so what? An official acknowledgment on behalf of a government agency must come from an "authoritative source," *Afshar*, 702 F.2d at 1131, a limitation that recognizes the fact that "in the arena of intelligence and foreign relations there can be a critical difference between official and unofficial disclosures," *Am. Civil Liberties Union v. Dep't of Defense*, 628 F.3d at 621. Plaintiffs' proposed use of unofficial statements to reinforce an official statement would blur that distinction. Even less clear is how Comey's unofficial statements can create a genuine dispute of material fact about the President's official statements. After all, statements from a non-authoritative source cannot possibly bolster or undermine statements from an authoritative source. The official statement must stand on its own—it either rises to the level of

a public acknowledgment or it does not.  The court therefore does not consider Comey's unofficial statements made to the SSCI as corroborative or supplemental evidence.

### 3.    *Statements of former Director of National Intelligence Clapper*

Finally, Plaintiffs rely on two statements of former Director of National Intelligence Clapper to support their waiver arguments.  On January 11, 2017, ODNI issued a press release from Director Clapper, which stated that he had "discussed the private security company document, which was widely circulated in recent months among the media, members of Congress and Congressional staff even before the [Intelligence Community] became aware of it."  *See* Exs. to Defs.' Reply, Ex. A, ECF No. 20-2 [hereinafter Clapper Statement].  The press release further reported that Director Clapper had advised President-elect Trump that the document "is not a product of the U.S. Intelligence Community" and that the Intelligence Community had "not made any judgment that the information in [the referenced document] is reliable.  *Id.*  As Director Clapper issued this press release during his service as Director of ODNI, it constitutes an official statement of ODNI.

The same cannot be said, however, of a second statement attributed to the former Director. After resigning from his position, Clapper on June 7, 2017, said that then-President-elect Trump had asked him "to publicly refute the infamous dossier," but that he declined to do so because he "could not and would not."  Exs. to Defs.' Reply, Ex. E, ECF No. 20-6.  Here, again, Plaintiffs invite the court to consider Clapper's statement made as a private citizen as "supplemental" information relevant to the official acknowledgment inquiry.  And, for the reasons already discussed, the court declines to do so.

*             *             *

With these background principles established—including the universe of official statements the court may consider—the court now turns to address the parties' substantive arguments.

## IV.    DISCUSSION

The parties' motions present three issues: (1) whether the FBI waived its *Glomar* response as to Item One of Plaintiffs' FOIA request by officially acknowledging the existence of the Synopsis; (2) whether the Defendants waived their *Glomar* responses as to Items Two and Three of Plaintiffs' FOIA request also by officially acknowledging the existence of responsive records; and (3) whether the Intelligence Community Defendants improperly withheld the Synopsis responsive to Item One.  The court addresses the first two issues in tandem followed by the third.

### A.    The Propriety of Defendants' *Glomar* Responses

#### 1.    The FBI's Glomar Response to Item One

The court begins with the FBI's *Glomar* response to Item One, i.e., Plaintiffs' request for a copy of the Synopsis.  Plaintiffs contend that, based on the President's statements and tweets and Director Comey's testimony to Congress confirming the existence of an investigation into Russian interference in the 2016 presidential election, it "is neither logical nor plausible that the Nation's premier law enforcement agency would not have an interest in (let alone possess) a document such as the [Synopsis]."  Pls.' Reply at 4.  The court disagrees that the cited statements compel such a conclusion.

For starters, none of the statements expressly reference the Synopsis.  To be sure, President Trump has acknowledged that the FBI has knowledge of the *Dossier*'s contents, notably telling the *New York Times* that Director Comey "brought it [the Dossier] to me."  Trump *NY Times* Interview at 16.  But even in that interview the President did not say that Director Comey presented

him with *the Synopsis*. This is not hair-splitting. Distinguishing between the two documents is critical, for the D.C. Circuit's decision in *Wolf* teaches that the record demanded must "match" exactly the record that is publicly acknowledged. In *Wolf*, the Circuit held that only those dispatches that Director Hillenkoetter's expressly read into the congressional record were officially acknowledged, but not any other. 473 F.3d at 373–74, 378. Here, though related, the Dossier and the Synopsis are distinct records, and none of President Trump's statements or tweets acknowledge the existence of the Synopsis, let alone that he received a copy of it from the FBI. Therefore, there has been no express recognition of the Synopsis' existence by either the President or any other official acting on behalf of the FBI. *See Nat'l Sec. Counselors v. CIA*, 898 F. Supp. 2d 233, 288–89 (D.D.C. 2012) (holding that, even assuming that the CIA officially acknowledged the existence of referral memoranda and correspondence regarding certain requests, the CIA was not precluded from issuing a *Glomar* response as to the existence of processing notes from those requests because "[t]he fact that they are separate documents make all the difference").

Nor can the court conclude, as Plaintiffs insist, that this case is just like *ACLU* and that it is neither logical nor plausible for the FBI to justify its refusal to confirm or deny whether it possesses the Synopsis. *See* Pls.' Reply at 4. It very well may be, as Plaintiffs contend, that it would be "professional malpractice" for the FBI, "the Nation's premier law enforcement agency," not to possess the Synopsis. *Id*. But the official acknowledgement standard is not an "surely the agency must have it" standard. The official statements themselves must "leave no doubt" that the agency possesses the requested records. *ACLU*, 710 F.3d at 429. Here, the President acknowledged in his *New York Times* interview that, at most, he received *some* information about the Dossier's contents from Director Comey, i.e., allegations concerning a trip to Russia for the

Miss Universe pageant, which the President characterized as "phony" and "made-up junk."[5]  *See* Trump *NY Times* Interview at 16.  It does not inexorably follow from that statement, however, that the FBI possesses the Synopsis.  To be sure, a document purported to be the Dossier is in the public domain and the media has reported on some of its more salacious allegations, but no official statement from any authoritative source has revealed its precise contents.  The same holds true for the government-drafted Synopsis.  Thus, to conclude that the President's statements to the *New York Times* constitute an official acknowledgment of the Synopsis, the court would have to speculate that the connection the President drew between his meeting with Director Comey regarding the Dossier, on the one hand, and with the Miss Universe pageant in Russia, on the other, is derived not only from the Dossier as presented by Director Comey, but from the Synopsis itself. The official acknowledgment doctrine does not countenance so great an inferential leap.

Moreover, this case differs from *ACLU* in a critical respect.  In *ACLU*, the question before the court was "whether it is 'logical or plausible' for the CIA to contend that it would reveal something not already officially acknowledged to say that the Agency 'at least has an intelligence interest' in such strikes."  710 F.3d at 429.  The court framed the question presented in that way because, given the nature of the plaintiff's FOIA request, the sole relevant justification for the CIA's *Glomar* response was "to keep secret whether the CIA *itself*" has "'at least has an intelligence interest in drone strikes.'"  *Id.* at 428–29 (citations omitted).  The court's holding in *ACLU* was that, in light of the President's and CIA Director's public statements about drone strikes, "it is neither logical nor plausible for the CIA to maintain that it would reveal anything not

---

[5] The court focuses on the President's interview with the *New York Times* interview because it is the only statement that Plaintiffs cite for the proposition that the President officially disclosed that Director Comey briefed him on the allegations contained in the Synopsis.

already in the public domain to say that the Agency 'at least has an intelligence interest' in such strikes." *Id.* at 430 (citation omitted).

Contrary to Plaintiffs' contention, *ACLU*'s narrow holding is not controlling here because the FBI in this case asserts a broader justification for issuing a *Glomar* response than merely concealing an "interest" in the Synopsis. As the FBI's declarant, David Hardy, puts it:

> [C]onfirming or denying that the FBI does or does not possess responsive records would require the FBI to confirm or deny whether it has and is investigating the alleged "dossier" and synopsis, either in a separate investigation or as part of its Russian interference investigation. Confirming or denying the existence or non-existence of a separate investigation or disclosing the focus or scope of the FBI's publicly-acknowledged pending Russian interference investigation could reasonably be expected to hamper and interfere with any such investigation.

Hardy Decl. at 7, ¶ 21. Hardy goes on to provide specific examples of how disclosing the FBI's investigative activities could cause the types of harms that Exemption 7(A) is designed to protect, including giving targets the opportunity to interfere with the investigation, conceal activities, and suppress, destroy, or fabricate evidence, as well as exposing witnesses and sources to harassment, intimidation, and physical injury. *Id.*

Plaintiffs take no issue with Hardy's representations, and the court is obligated to defer to the FBI's judgment about the law enforcement risks attendant to disclosure. *See Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927–28 (D.C. Cir. 2003). And, more importantly, Plaintiffs have not identified any public statements that would render Hardy's substantive justifications for issuing a *Glomar* response "neither logical nor plausible." *ACLU* does not preclude a *Glomar* response in such circumstances.

Finally, unable to point to any official statement by President Trump or Comey that puts the Synopsis in the hands of the FBI, Plaintiffs seek to use Comey's testimony before the SSCI as

"corroborative" evidence of an official disclosure.  Pls.' Mem. at 8–10, 14–15.  Those statements are not from an authoritative source, however, as Comey had left government service at the time of his testimony.  For the reasons already discussed, Plaintiffs cannot rely on unofficial statements to "corroborate" an official disclosure that never occurred.

Accordingly, the court concludes that the FBI properly issued a *Glomar* response to Item One.

### 2. *Defendants'* Glomar *Responses to Items Two and Three*

Moving on to Items Two and Three of Plaintiffs' FOIA request, the court finds that neither the President nor any representative of the defendant agencies has officially acknowledged the existence or non-existence of, respectively, any "final determinations" about the accuracy of the allegations contained in Synopsis or any investigative files relating to a "final determination." Defendants have therefore properly issued *Glomar* responses to Items Two and Three.

Plaintiffs offer, in the main, a bevy of statements by the President that they urge necessarily disclose that the FBI and Intelligence Community Defendants have engaged in "some type of effort . . . to investigate the accuracy of the claims originally made in the dossier."  Pls.' Notice of Suppl. Information, ECF No. 23; *see* Pls.' Second Notice of Suppl. Information, ECF No. 24. These statements—derived from media interviews and tweets—invariably characterize the Dossier and its contents as "discredited," "phony," "fake," "false," or "bogus." *E.g.*, Trump *NY Times* Interview; Trump Fox Business Interview; Trump Full Measure Interview; Oct. 19 Tweet; Oct. 21 Tweet; Dec. 26 Tweet.  Plaintiffs also cite the President's various statements that Director Comey told him that he was not under investigation as proof of the publicly acknowledged existence of responsive records.  Pls.' Reply at 5.  Finally, Plaintiffs point to Director Clapper's

press release of January 11, 2017, in which he stated that the Intelligence Community had not made any judgment on the reliability of the Dossier's allegations.[6]

Plaintiffs do not argue that either President Trump or any agency official *expressly* has acknowledged the existence of documents responsive to Items Two and Three. Nor could they, because as already discussed, none of the cited statements refer to purported "final determinations" about the Synopsis's factual contentions, as distinct from the factual contentions in the Dossier. That distinction makes a difference, *see Wolf*, 473 F.3d at 373–74, 378, and, for that reason alone, Plaintiffs have not shown that the existence of documents responsive to Items Two and Three has been officially acknowledged.

Unable to identify any express reference to the records sought, Plaintiffs once more rely on *ACLU*, asserting that it is neither "logical nor plausible" for Defendants to deny the existence of responsive records. Pls.' Mot. at 13; Pls.' Reply at 5. To that end, Plaintiffs ask the court to apply a "presumption of regularity" to the President's statements and tweets. As Plaintiffs see it, because even presidential tweets are "official statements of the President of the United States," Defs.' Mem. re: Tweets at 4, the court must presume that, when he addresses the public, the President is properly discharging his official duties and relying on "official U.S. Government information" to do so. Pls.' Reply at 6 (citing *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007)). So, according to Plaintiffs, when the President tweets that the Dossier is "discredited" or "fake," absent contrary evidence, the court should presume that the President's tweet is based on record information presented by the FBI or the Intelligence Community. To

---

[6] Director Clapper did not use the word "Dossier" in his press release; however, in light of the Intelligence Community Defendants' admission that they possess the Synopsis, there can be little doubt that the "private security company document" referenced in the press release is in fact the Dossier.

proceed in any other manner, Plaintiffs maintain, "would eviscerate the 'official acknowledgment' exception." *Id.* at 7.

Plaintiffs' arguments fail for two reasons. First, the presumption of regularity is inapposite in this context. And, second, unlike the statements at issue in *ACLU*, the public statements in this case do not render Defendants' justification for issuing a *Glomar* response "neither logical nor plausible."

The presumption of regularity applies to a public official's discharge of official duties, not to his or her uttering of official statements. "The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926). Applying the presumption is most appropriate where a government official or entity conducts official acts in the manner provided by statute, regulation, or policy. For example, agencies are presumed to comply with their FOIA obligation to disclose reasonably segregable material, *Sussman*, 494 F.3d at 1117, and to properly produce and process government documents, such as "official tax receipts," *Riggs Nat'l Corp. v. Comm'n*, 295 F.3d 16, 21 (D.C. Cir. 2002), and immigration entry forms, *Nardea v. Sessions*, No. 16-1274, 2017 WL 5776501, at *4 (4th Cir. Nov. 29, 2017). In short, the presumption of regularity applies to "actions taken or documents produced within a process that is generally reliable[,] . . . transparent, accessible, and often familiar." *Latif v. Obama*, 677 F.3d 1175, 1207 (D.C. Cir. 2012) (Tatel, J. dissenting). Plaintiffs point to no case law that expands the presumption to official statements such that, absent contrary evidence, courts must presume that an official statement is premised upon documents in the government's possession. Accordingly, the court declines to apply the presumption of regularity to this context.

Nor are the public statements in this case "tantamount to an acknowledgment that the [agency] has documents on the subject" of the veracity or credibility of the Synopsis' factual contentions. *See ACLU*, 710 F.3d at 431. Start with the President's tweets. Plaintiffs themselves concede that "[i]t may be the case that President Trump issued his tweets based strictly and exclusively upon his own personal knowledge independent of what he has learned as President of the United States, as well as what he may have seen on cable television." *See* Pls.' Resp. to Defs.' Resp. to Pls.' Notices, ECF No. 26 at 2–3. Plaintiffs' concession is a wise one, because none of the tweets inescapably lead to the inference that the President's statements about the Dossier are rooted in information he received from the law enforcement and intelligence communities. Take for instance the following three tweets, which the President posted on October 19, 2017; October 21, 2017; and November 29, 2017, respectively:

> Workers of firm involved with the discredited and Fake Dossier take the 5th. Who paid for it, Russia, the FBI or the Dems (or all)?

> Officials behind the now discredited "Dossier" plead the Fifth. Justice Department and/or FBI should immediately release who paid for it.

> The House of Representatives seeks contempt citations(?) against the Justice Department and the FBI for withholding key documents and an FBI witness which could shed light on surveillance of associates of Donald Trump. Big stuff. Deep State. Give this information NOW! @foxnews

Oct. 19 Tweet; Oct. 21 Tweet; Nov. 29 Tweet. All three tweets reference an ongoing news event,[7] as opposed to information that only could be gleaned from government records. *Cf. ACLU*, 710

---

[7] On October 19, 2017, at least one media outlet reported that two partners of Fusion GPS—the firm that commissioned the Dossier—invoked the Fifth Amendment instead of testifying before the House Permanent Select Committee on Intelligence. *See* Defs.' Resp. to Pls.' Notices, ECF No. 25, Ex. B, ECF No. 25-3. And, on November 29, 2017, Fox News reported that a senior counsel for the House Permanent Select Committee on Intelligence had urged Chairman Devin Nunes to issue contempt citations against the Department of Justice and the FBI. *See* Pls.' Fourth Notice of Suppl. Info. at 2–3; Defs.' Resp. to Pls.' Fourth Notice of Suppl. Info., ECF No. 33, Ex. B, ECF No. 33-3. .

F.3d at 431 (finding it implausible that statements about drone strikes could be made without "having examined a single document in [the] agency's possession"). In such circumstances, there is little reason to believe that the President's characterization of the Dossier as "fake" and "discredited" is necessarily premised on information found in government records. Moreover, the November 29, 2017 tweet does not, as Plaintiffs insist, acknowledge the existence of "key documents" responsive to Items Two and Three of their request. Pls.' Fourth Notice of Suppl. Info., ECF No. 31 at 2–3. The referenced "key documents . . . which could shed light on surveillance of associates of Donald Trump" do not "match" Plaintiffs' demand for records relating to "final determinations" made about the factual allegations contained in the Synopsis. Therefore, none of the above three tweets constitutes an official disclosure of the requested records.

The same holds true for the President's most recent tweet cited by Plaintiffs. That tweet, posted on December 26, 2017, describes the Dossier as "bogus" and asserts that the "FBI CANNOT (after all this time) VERIFY CLAIMS IN DOSSIER." That tweet, however, explicitly refers to the Twitter handle for the morning news show Fox & Friends ("@foxandfr[i]ends") and appears to quote statements made on that program. *See* Dec. 26 Tweet. Indeed, at least one media outlet reported that persons appearing on Fox & Friends on that date made statements similar to those contained in the President's tweet.[8] Thus, the President's latest tweet about the Dossier does no more to confirm the existence of "final determinations" and related documents than the earlier three tweets.

Other statements demonstrate quite plausibly that the President's characterizations of the Dossier's charges likely come from yet another source—his personal knowledge. The *New York*

---

[8] According to Fox News, on December 26, 2017, the discussion on Fox & Friends concerned a Washington Times report that the FBI has acknowledged that the central charges in the Dossier are unsubstantiated. *See* Defs.' Resp. to Pls.' Fifth Notice of Suppl. Info., ECF No. 35, Ex. B, ECF No. 35-3.

*Times* interview is illustrative. There, the President explained that he knew the Dossier to be "phony" because—at least with respect to the Miss Universe pageant in Russia—he was "just there for a very short time" and he had "witnesses," including his bodyguard, who the President said could debunk any allegations relating to that trip. *NY Times* Interview at 16. The President's statements to the *New York Times*—or to any other news outlet—do not leave the court firmly convinced that the defendant agencies possess records concerning any "final determinations."

To make their case, Plaintiffs lean heavily on two cases, *ACLU* and *Smith v. CIA*, 246 F. Supp. 3d 28, 31 (D.D.C. 2017). Both are readily distinguishable. In *ACLU*, the court considered a series of public statements made by President Obama; the President's head counterterrorism advisor, John Brennan; and CIA Director Leon Panetta, all of which acknowledged that the United States uses drones to target al-Qaeda terrorists. *ACLU*, 710 F.3d at 428–32. The CIA Director's statements went even further and assured that drone strikes are precise and limit collateral damage. *Id.* at 429–30. Here, in sharp contrast to the statements evaluated in *ACLU*, it does not "beggar belief" to think that the President made statements and tweets about the Dossier without having examined, or received, information contained in documents held by the FBI or the Intelligence Community. As already discussed, the President's statements may very well be based on media reports or his own personal knowledge, or could simply be viewed as political statements intended to counter media accounts about the Russia investigation, rather than assertions of pure fact. But the same simply cannot be said about the CIA Director's statement concerning the accuracy of drone strikes. The existence of these alternative plausible inferences is what distinguishes this case from *ACLU*.

*Smith* is of no help to Plaintiffs for the same reason. There, the plaintiff sought copies of line items in the CIA's budget supporting Israel, to which the agency issued a *Glomar* response.

246 F. Supp. 3d at 30.  The court, however, rejected the *Glomar* response, holding that the existence of documentation was officially acknowledged by President Obama in a speech in which he asserted that "Israel can defend itself against any conventional danger" "partly due to American military and intelligence assistance, which my administration has provided at unprecedented levels."  *Id*. at 32.  Relying on *ACLU*, the court explained that it was neither logical nor plausible for the CIA to deny that it had line items related to intelligence assistance, as the President's statements readily gave rise to an inference that the CIA was providing intelligence support to Israel and therefore established the existence of *some* budgeted amounts reflected in line items for supplying such assistance.  *Id*. at 33–34.  Stated differently, it "beggar[ed] belief" that the CIA— the federal agency tasked with providing intelligence support abroad—would not have budget line items for providing intelligence assistance to Israel after President Obama had touted doing so at "unprecedented levels."  Here, in comparison, no ready inference can be drawn between President Trump's statements and records concerning any "final determinations" made about the Synopsis.  For reasons that need not be repeated, the President's statements in this case do not incontrovertibly give rise to the inference that such records must exist.

In the end, Plaintiffs' position boils down to this:  President Trump's public statements about the Dossier must be based on extant government documents because it is implausible to believe that the President would make "official" statements about issues pertaining to national security unless tethered to information contained in government records.  *See* Pls.' Resp. to Defs.' Suppl. Submission, ECF No. 30, at 7 (arguing that "[i]t borders on axiomatic that if we take the President at his word his official disclosures are based upon information he gleaned from official U.S. Government documents").  The weakness of that position is readily laid bare when viewed in a different context.  Take the following recent tweet issued by the President on January 2, 2018:

> Crooked Hillary Clinton's top aid[e], Huma Abedin, has been
> accused of disregarding basic security protocols. She put Classified
> Passwords into the hands of foreign agents. Remember sailor[']s
> pictures on submarine? Jail! Deep State Justice Dept must finally
> act? Also on Comey & others

@realDonaldTrump, Twitter (Jan. 2, 2018, 4:48 AM),

https://twitter.com/realDonaldTrump/status/948174033882927104. Applying Plaintiffs' logic to this tweet, the court would have to find that federal law enforcement agencies have determined that Secretary Clinton's former aide, Huma Abedin, gave foreign agents classified passwords and that documents exist to support that conclusion. But no reasonable jurist would so hold based on the President's tweet alone. To be sure, a presidential tweet could satisfy the stringent requirements of the official acknowledgement doctrine. But it does not follow that just because a tweet is an "official" statement of the President that its substance is necessarily grounded in information contained in government records. In this instance, the court agrees with Defendants that regardless of the medium by which the President communicates with the public, "the significance of any statement . . . depend[s] on its substance." Defs.' Mem. re: Tweets, at 5–6 n.4. And, in this case, nothing about the substance or context of the President's statements—or the official statements of Director Comey or Director Clapper—convinces the court that the President or any executive branch officer has officially acknowledged the existence of documents responsive to Items Two and Three.

*       *       *

Finally, in the alternative, Plaintiffs assert that a factual dispute exists as to the President's basis for describing the Dossier as "discredited," "phony," and "fake," thereby precluding the entry of summary judgment and "requir[ing] an inquiry by this Court." *See id.* at 7–8. There is, however, no factual dispute on this record. Plaintiffs offer little more than wishful thinking that

the documents they request must exist.  But wishful thinking does not create a genuine dispute of fact in a FOIA case.  *Cf. SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) ("Mere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them.").  In short, there is nothing in the record that "controvert[s]" Defendants' justification of their *Glomar* response or otherwise indicates "agency bad faith."  *Wolf*, 473 F.3d at 374.  Accordingly, no factual dispute precludes the granting of summary judgment in favor of Defendants as to their *Glomar* responses.

### B.      Improper Withholding

At last, the court turns to the propriety of the Intelligence Community Defendants' invocation of Exemptions 1 and 3 to withhold the Synopsis from production.  Plaintiffs do not substantively challenge the agencies' reliance on Exemptions 1 and 3.  Instead, they argue that Comey's *unofficial* testimony before the SSCI—specifically, that the President denied that he had "been involved with hookers in Russia"—disclosed some of the specific content contained in the Synopsis, thereby creating a genuine issue of material fact that precludes granting summary judgment.  *See* Pls.' Mem. at 15–16; Comey SSCI Written Testimony at 6.  An unofficial statement cannot, however, be used to show that the contents of a withheld record have been officially acknowledged.  *See Afshar*, 702 F.2d at 1133–34.  And even absent this fatal shortcoming, the former FBI Director's unofficial statements are not imputable to the Intelligence Community Defendants, *see Mobley*, 806 F.3d at 583 ("Disclosure by one federal agency does not waive another agency's right to assert a FOIA exemption."), and are wholly insufficient to satisfy *Fitzgibbon*'s three-pronged test.  The Intelligence Community Defendants therefore are entitled to summary judgment as to their withholding of the Synopsis.

**V.     CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted and Plaintiffs' Cross-Motion for Partial Summary Judgment is denied.  A separate Order accompanies this Memorandum Opinion.

Dated:  January 4, 2018
                                          _____
                                          Amit P. Mehta
                                          United States District Judge